# Third District Court of Appeal

## State of Florida

Opinion filed April 20, 2016.
Not final until disposition of timely filed motion for rehearing.

————————

No. 3D15-2593
Lower Tribunal No. 15-15503

————————

**B.J., the Mother,**
Appellant,

vs.

**Department of Children and Families, et al.,**
Appellees.

An appeal from the Circuit Court for Miami-Dade County, Maria Sampedro-Iglesia, Judge.

Eugene F. Zenobi, Criminal Conflict and Civil Regional Counsel, Third Region, and Kevin Coyle Colbert, Assistant Regional Counsel, for appellant.

Karla Perkins, for the Department of Children and Families; Laura J. Lee (Sanford), for the Guardian ad Litem Program, for appellees.

Before SUAREZ, C.J.,* and SHEPHERD and LOGUE, JJ.

————————————

* Chief Judge Suarez did not participate in oral argument, but participated in the decision.

SUAREZ, C.J.

The mother, B.J., seeks to reverse the trial court's order of adjudication and disposition of dependency of the minor child, A.G. We reverse, as the totality of the circumstances presented in this case fails to provide competent substantial evidence to support the adjudication of dependency.

FACTS

The mother, B.J., and the father and their two children spent a weekend in a hotel in Broward as a family. The mother co-slept with her four-month old son, Ab.G., and then one-year old daughter, A.G. The father slept on the fold out sofa. B.J. awoke to find the four-month old cold and unresponsive. The parents called 911, but the paramedics were unable to revive the child. The hotel room was messy, cluttered with empty food cartons and there was some blood on a towel. That evening, Broward County child protective services (CPI) contacted the parents, who were staying at the home of a friend from church, to follow up on investigating the baby's death.[1] The parents admit that after the Broward County CPI left, they left A.G. asleep on the sofa downstairs while their friend was asleep upstairs to go to another friend's house. The parents submitted to drug testing the following morning, and tested positive for cannabis. They admitted to having smoked the night before. The parents then came back to Dade County. Over the

---

[1] The Broward medical examiner ruled the infant son's cause of death was sudden unexplained infant death associated with co-sleeping.

next several days, the Broward County CPI officer sporadically attempted to make contact with the parents, left messages with them to call back, but the parents never responded. The parents gave various reasons for failing to return the calls. The record shows that nearly one month later, after failing to make contact with the parents, the Broward County CPI called in a "missing person in danger" report for A.G. for the sole purpose of obtaining a pick-up order for the child.[2] Over a week later, the Dade County CPI officer was given a copy of the pick-up order for A.G. He found the child with her parents living in an efficiency behind the paternal grandmother's house and removed her. He testified that when he arrived to pick up A.G., she was clean, well-groomed, appeared healthy and with no indications of abuse. At the shelter hearing, the trial court ruled that "any one of these factors would not be enough to rise to the level of a dependency (dirty hotel room, parents admitting to smoking cannabis, apparent evasiveness)." The trial court ruled, however, that the totality of the circumstances indicated that the remaining child. A.G., was at prospective risk of neglect where the mother continues to co-sleep

---

[2] The Broward County CPI testified that she tried to contact the parents immediately after the March 9, 2015, death of infant Ab.G. to follow up on Ab.G's case. At that time, there was no open case on A.G. Between March 12 and 14, 2015, the Broward CPI attempted to contact the father and mother by phone, and left her card with relatives. The Broward County CPI received a new phone number for the father on March 23, 2015, but could not remember if she tried to contact the father via the new number. It was nearly one month later, on April 22, 2015, that the Broward CPI called in an abuse report in Miami specifically to trigger a pick-up order for A.G., which order was carried out by the Miami-Dade CPI on May 1, 2015.

with the now-three-year-old child despite knowledge of the risk. The trial court adjudicated A.G. dependent, placed her with the maternal grandmother, with the goal of reunification.

## APPLICABLE LAW

To adjudicate a child "dependent," the trial court must find that the Department of Children and Families ("DCF") proved the allegations set forth in the verified petition for dependency by a preponderance of the evidence. M.F. v. Fla. Dep't of Children & Families, 770 So. 2d 1189, 1192 (Fla. 2000). An appellate court reviews "an adjudication of dependency for an abuse of discretion, and will uphold the determination if the trial court applied the correct law and its ruling is supported by competent, substantial evidence." Id. at 1192; R.F. v. Fla. Dep't of Children & Families, 770 So. 2d 1189, 1192 (Fla. 2000); D.A. v. Dep't of Children & Family Servs., 84 So. 3d 1136 (Fla. 3d DCA 2012).

The trial court recited three "factors" that it believed provided a basis for the dependency order when viewing the totality of circumstances: the dirty hotel room, the parents' leaving the child asleep at a friend's house as they went to another friend's house (where they smoked some cannabis), and the alleged evasiveness of the parents toward DCF's subsequent investigation into the sibling's death – not into A.G.'s circumstances. The trial court concluded that any one of the "factors" shown in this case would not be sufficient to order the child dependent, but taken

4

together, show that the child "has been harmed," as defined in §39.01(30)(k) and (l)[3], and that the child is at "prospective risk of neglect," pursuant to §39.01(44)[4] as a result of the mother continuing to co-sleep with the child A.G., who is now almost three years old.

To support an adjudication of dependency, the parent's harmful behavior must be a present threat to the child. See B.C. v. Dep't of Children & Families, 846 So. 2d 1273 (Fla. 4th DCA 2003). A "[c]hild who is found to be dependent" includes, among other things, one who has been "abandoned, abused, or neglected" by the parents, or a child who is found "[t]o be at substantial risk of imminent abuse, abandonment, or neglect" by the parents. See § 39.01(14)(a) & (f), Fla. Stat. (2002). Therefore, before we can affirm a trial court's adjudication of dependency,

---

[3] § 39.01(30), Fla. Stat. (2015): "Harm" to a child's health or welfare can occur when any person:
. . .
   (k) Has allowed a child's sibling to die as a result of abuse, abandonment, or neglect.
   (l) Makes the child unavailable for the purpose of impeding or avoiding a protective investigation unless the court determines that the parent, legal custodian, or caregiver was fleeing from a situation involving domestic violence.

[4] § 39.01(44), Fla. Stat. (2015): "Neglect" occurs when a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired. . . .

we must find competent, substantial evidence that the child was either abandoned, abused, or neglected, or that the risk of abandonment, abuse or neglect is imminent. There is no competent substantial evidence in the record to support either theory.

An abused child is one who is subjected to "any willful act or threatened act that results in any physical, mental, or sexual injury or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired." § 39.01(2), Fla. Stat. (2015). "Harm" is defined by statute to include a parent's "continued chronic and severe use of a controlled substance or alcohol" if "the child is demonstrably adversely affected by such usage." §39.01(30)(g), Fla. Stat. (2015). Here, there is nothing in the record to suggest that either of the parents exhibit "continued and chronic" or "severe" use of marijuana <u>and</u> nothing in the record suggest that A.G. is demonstrably adversely affected by such usage. The parents testified that they rarely smoked marijuana, and the record shows the child was always observed to be in good health, clean, and well cared for.

Finally, the record does not contain any competent substantial evidence of imminent prospective abuse, abandonment, or neglect.[5]  See <u>B.D. v. Dep't of</u>

---

[5] Fla. Stat. §30.01(15) (f):  "Child who is found to be dependent" means a child who, pursuant to this chapter, is found by the court:
(f) To be at substantial risk of imminent abuse, abandonment, or neglect by the parent or parents or legal custodians;  . . .

_Children & Families_, 797 So. 2d 1261, 1262 (Fla. 1st DCA 2001); In re J.L., 824 So. 2d 1023, 1025 (Fla. 2d DCA 2002). The trial court's Order of Dependency closes with finding that the "totality of the circumstances show that the Child, A.G., is at prospective risk of neglect." "The terms 'prospective' and 'imminent' are not defined in the statute. 'Prospective' simply means likely to happen,' or 'expected.' 'Imminent' encompasses a narrower time frame and means 'impending' and 'about to occur.' " E.M.A. v. Dep't of Children & Families, 795 So. 2d 183, 186 n. 3 (Fla. 1st DCA 2001) (internal citations omitted); In re J.L., 824 So. 2d at 1025. J.B.M. v. Dep't of Children & Families, 870 So. 2d 946, 951 (Fla. 1st DCA 2004). There is no competent substantial evidence in the record to sustain a finding of prospective risk of neglect.

To the extent that DCF implies the adjudication in this case was appropriate based upon a "danger" that the physical, mental, or emotional health of A.G. would be significantly impaired in the future, the evidence still must meet the imminency requirement of section 39.01(14)(f). See B.C., 846 So. 2d at 1274; see also In re: J.L. v. Dep't of Children & Family Servs., 824 So. 2d 1023, 1025 (Fla. 2d DCA 2002) ("[w]hile prospective neglect or abuse can be a basis for an adjudication of dependency, the Department must meet the statute's imminency requirement"); E.M.A., 795 So. 2d at 185 ("The statutory definitions of 'abuse' and 'neglect' do not expressly include [a] requirement of imminence. However, when [absent actual

7

abuse, abandonment or neglect] these definitions are read in pari materia with the related language in section 39.01(14)(f), a risk of imminent neglect seems to be required to establish that a child is 'dependent' as a matter of law.") (internal citations omitted); J.C. v. Florida Dep't of Children & Family Servs., 937 So. 2d 184, 191 (Fla. 3d DCA 2006).  There is no legal merit in the State's assertion of imminent harm and no competent substantial record evidence to suggest it.

PROCEEDINGS

**SIBLING'S DEATH**:  There is no competent substantial evidence in the record that A.G.'s sibling died as a result of abuse, abandonment or neglect so as to be deemed "harm" to A.G. pursuant to the language of §39.01(30)(k).[6]  The expert medical examiner testified that there was no explanation for the death (that is, it was not caused by abuse, neglect, etc.), and concluded that SIDS with co-sleeping as a potential factor was the cause of death.   SIDS with co-sleeping as a potential factor is nowhere classified in this record or in any statute as abuse, abandonment or neglect.

Further, the pick-up order, shelter order, and verified petition for dependency are misleading in their recitation of the facts.  For example, although the parents tested positive for cannabis the day after the child died, the shelter order suggests by its wording that the child died while the parents were under the

---

[6] See FN.3, infra.

influence of cannabis.[7]  This is an inaccurate characterization of the actual facts and leads to an incorrect assumption that the child should be removed from the parents' care because they abuse drugs and thus the child has been abandoned, abused or neglected or is in imminent danger of illness or injury.  For example, the shelter petition and petition for dependency recite:

> 4. Interview/Facts/Evidence obtained by CPI during Investigation:
> Contact was made with Plantation Police and was advised that there is active order signed by a judge in Broward County removing the child from the care of her parents and placing her into state custody. Drug tests were administered to both parents who voluntarily took tests, mother was positive for Marijuana while father tested negative for all substances. Child was recovered with the assistance of North Miami Beach Police Officer at the home of the paternal grandmother.
> .   .   .
>
> 7. Grounds for Removal:
> [D. **There is probable cause**, (clear and convincing if ICWA case) that reasonable grounds for removal exist, the provision of appropriate and available services will not eliminate the need for placement, the child(ren) are dependent, and shelter care is necessary and in the best interest of the child(ren) because:
> **The child(ren) has/have been abused, abandoned, or neglected or is/are in imminent danger of illness or injury as a result of abuse, abandonment, or neglect;**

---

[7]  See. e.g., T.G. v. Dep't of Children & Families, 927 So. 2d 104, 107 (Fla1st DCA 2006), in which the Department and the trial judge made much of the father's prior, limited drug use. The father failed one drug test in 2004.   No evidence indicates the father was addicted to either cocaine or marijuana. Moreover, no evidence shows that any of the children were harmed as a result of the father's past drug use. In fact, the father admitted smoking a marijuana cigarette—which led to his failed drug test—at a party outside of the family home.  Accordingly, the lone positive drug test of the father does not constitute competent substantial evidence to support a finding of dependency.

\* \* \*

The Department has made reasonable efforts, as described in the "AFFIDAVIT TO DEPENDENCY SHELTER PETITION," to prevent or eliminate the need for removal or continued removal of the Child(ren), or an emergency situation prevented these efforts.

9. Continuation of the Child(ren) in the home is **contrary to the welfare of the Child(ren)** because:
A. The home situation presents a **substantial immediate danger to the Child(ren), which cannot be mitigated by the provision of preventive** services, because of the reasons that are described in the "AFFIDAVIT TO DEPENDENCY SHELTER PETITION."
B. The Child(ren) **cannot safely remain at home**, either because there are no preventive services that can ensure the safety of the Child(ren), or because even with the appropriate and available services being provided, the safety of the child cannot be ensured.

[Emphases added].

As another basis for dependency, the DCF set forth the parents' "prior history with the department," citing reports generated when the mother was a teenager in 2003 and 2007, which cases were "disposed with no indicators." The father's last criminal event was in 2014 for possession of marijuana, in which case adjudication was withheld. His prior two criminal charges were also adjudication withholds. The petition goes on to state:

These activities and/or environments harmed the Child as defined in Section 39.01(30), Florida Statutes (2014) and /or caused or are likely to cause the Child's physical, mental or emotional health to be significantly impaired or to be in danger of being significantly impaired.

10

It is a considerable stretch to say that the Child <u>has or will be harmed</u> by events that occurred several years prior to her birth in 2013 (as to the Mother) and for the father's minor possession charge which had absolutely no connection to the child's care. See, e.g., <u>T.G. v. Dep't of Children & Families</u>, 927 So. 2d 104, 107 (Fla. 1st DCA 2006) (finding that father's lone positive drug test was not competent substantial evidence to sustain dependency). Once again, we observe that the record shows the child to have been healthy, happy, well-groomed and well cared for.

**HOTEL ROOM**: There are several description of the condition of the hotel room when the youngest child died; one of the police officers described take-out containers, tossed clothing, sofa cushions on the floor, and observing a few "bloody" towels. The hotel housekeeping supervisor described the room as cluttered, when she testified that a stroller was right by the door, chairs, "stuff was all over the place," which she described as "trash, clothes, everything." The CPI investigator testified that because the family had been evicted, they stayed together in hotel rooms where the mother could cook. The mother testified that the couch cushions were off because it is a fold-out bed and the father was sleeping on it; the "trash" was from cooking packages; the blood on the towels was because B.G. had run out of sanitary napkins and had to use the towels. All of these explanations are reasonable for people in difficult financial circumstances, finding themselves

11

without permanent housing, and with a cluttered room resulting from a long weekend spent with young children. These observations are not, however, substantial competent evidence of abuse, neglect or imminent risk of harm to the child sufficient to support a dependency order.[8]

**EVASIVENESS:** There is no competent substantial evidence in the record that the CPI's inability to contact the parents, or the parents' failure to contact the CPI was a result of the parents' purposefully evading the CPI's investigation. The circumstances can just as easily be explained by neglect, miscommunication, or happenstance. The Broward County CPI testified that she called in an abuse allegation solely to trigger a case with a pickup order simply because she could not find the parents to follow up with A.G. She also testified that the parents only knew that she was investigating the sibling's death; A.G. was not added to her case until after the matter of the sibling's death had been closed. The parents testified that, under the circumstances (child's death, being without a permanent address, financially unstable), it did not occur to them to return the call. This does not translate into willful evasiveness.

**CO-SLEEPING WITH A.G**.. Children who have not been abused may still be found to be at substantial risk of imminent abuse and declared dependent by

---

[8] There is no testimony or other evidence in the record that the home where the child lives is dirty or endangers her health or welfare. To the contrary, the Miami-Dade County CPI testified that when he went to the parent's efficiency apartment to pick up A.G. he found her to be clean, well-fed, well-clothed and healthy.

a court as a result of abuse inflicted upon a sibling. See In re M.F., 770 So. 2d 1189, 1194 (Fla. 2000). This is what the trial court seems to suggest in its dependency order when it recites "prospective risk of neglect" with "there is no reassurance that the Mother will not continue to co-sleep with A.G., as the Mother stated she has done so practically every day despite knowing its dangers." However, the evidence fails to demonstrate a nexus between the death of A.G.'s sibling and speculative prospective abuse to A.G. from co-sleeping. See C.W. v. Dep't of Children & Family Servs., 944 So. 2d 1197, 1198-99 (Fla. 3d DCA 2006). Co-sleeping was provided by the M.E. as a possible factor in the 4-month old sibling's death – there is no evidence of abuse or neglect toward A.G.'s sibling that contributed to his death, which was ruled natural and unexplained. There is no evidence offered by the State to suggest a risk to A.G. from co-sleeping now that A.G. is nearly three years old.

The State has not provided any substantial competent evidence that A.G. was or is in imminent danger of abuse, neglect or any harm; the sibling's death was ruled SIDS; the allegation of "evasiveness" is at most attributable to the parents' negligence, and not willful evasion of any investigation. The reasons the State provides for alleging imminent danger of harm are, at best, speculative. There is absolutely no evidence that A.G. has been or may be imminently deprived of necessary food, clothing, shelter, or medical treatment. "The State of Florida does

not demand perfection from its families. Instead, the State demands that children be protected from abuse and from the substantial risk of imminent abuse." T.G. v. Dep't of Children & Families, 927 So. 2d 104, 107 (Fla. 1st DCA 2006).  The trial court abused its discretion by accepting the allegations without competent substantial evidence of past, present or imminent harm sufficient to support separating A.G. from her parents.

We therefore reversing the trial court's Order of Adjudication and Disposition and remand for immediate proceedings consistent with this ruling.

Reversed and Remanded.